IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.__3:07cr317-WKW-WC_____ |
| | ) | |
| ROBERT DOUGLAS BARNETT | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and files this response to Defendant Robert Douglas Barnett's Motion to Suppress Seizures and Statements With Citations of Authority (Doc. #10) (hereinafter "Motion").

The defendant has asked this Court to suppress all items seized from him and "all information obtained from such seizures," as well as all information, including statements, obtained as a result of his arrest, search and interrogations on or about May 4, 2005.  Mot. at 1. What is really at issue in this felon-in-possession case, however, is the ultimate fate of two guns and some ammunition that were found concealed within two smaller containers inside a gym-bag the defendant was carrying when he was stopped.  Because the stop was valid, and because the search was performed after obtaining the defendant's voluntary consent, and incident to his lawful arrest, the Motion has no basis in fact or law and should accordingly be denied.

### Background

The relevant facts and circumstances of the defendant's arrest on May 4, 2005, are adequately summarized in the Special Report of Auburn Police Department Officer Michael Creighton (hereinafter "Report" and attached hereto as Government's Exhibit 1):

On [5-4-05, at 00:22 hrs] I was on routine patrol in the area of Saugahatchee Rd. and CSX RR. This is also where the business of The Highlands bar is located. There was a recent auto burglary at The Highlands on 5-3-05 that occurred between 2300 hrs and 0145 hrs (ref case number 05005549), after speaking with Officer McCormick, it was learned that the victim's vehicle in that auto burglary was parked in that back of the parking lot, near the dumpster, which is right next to the railroad tracks. While on patrol I observed a black male dressed in all dark clothing walking along the railroad tracks. I contacted him and asked for his identification. I asked where he was coming from and going to and he stated that he was coming from the bowling alley and walking home to Opelika along the tracks. While I was running his ID card and checking for warrants Officer Morris arrived on scene. Due to the totality of the circumstances (the time of night, 00:22 hrs, the recent burglary, the all dark clothing and officer's safety reasons) I felt the need to search his bag that he was carrying. I then asked for permission to search his gym-type bag that he was carrying and I told [him] that this was an area where we have had a few break-ins. He stated that he would not mind if I looked in his bag. While looking in the bag I located a smaller bag used to carry a pistol. When I opened this bag I located a small .25 semi-auto pistol. Barnett stated that he did not have a permit for the pistol. I then placed him under arrest for carrying a pistol without a permit. Officer Morris and I continued to search the bag and located another bag [a toiletry kit] within the gym-type bag, and in this bag was a .357 revolver with several boxes of ammunition in the bag. Both weapons were unloaded, but the fully loaded magazine for the .25 was in the same pistol bag with it. Both handguns and ammunition were taken into evidence and placed into property at the Auburn Police Dept. While at the Lee Co. Jail I had dispatch run a criminal history on Barnett and it was discovered that he had two prior convictions for robbery, one in 1976 and another in 1982, both of which he was sentenced to prison. It was also discovered that he was convicted in 1991 of a felon in possession of a handgun. All of the above listed previous offenses occurred in Opelika.

### **Burden of Proof**

To succeed on a motion to suppress, the defendant has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure. *See United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000); *United States v. Braithwaite*, 709 F.2d 1450, 1453 (11th Cir. 1983). When the issue is one of consent, the government bears the burden of proving the consent was voluntary. *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).

2

## Summary of Argument

In his Motion (at 3-4), the defendant outlines four arguments for suppression:

1. The warrantless detention and arrest of Mr. Barnett on May 4, 2005 were without probable cause or proper legal authority.

2. The search of Mr. Barnett on May 4, 2005 was the fruit of his improper detention and arrest and was without probable cause or proper legal authority.

3. The interrogations of Mr. Barnett on May 4, 2005 were the fruit of his improper detention and arrest in violation of the Fourth Amendment and were in violation of his rights under the Fifth Amendment.

4. Mr. Barnett's waivers, if any, of his rights to refuse a police search or his rights to request counsel during custodial interrogation, were not knowing, voluntary, and intelligent under the totality of circumstances.

All four of these arguments fail. The warrantless detention of the defendant was a lawful consensual encounter that turned into a lawful *Terry* stop of reasonable scope and duration. The defendant's warrantless arrest was supported by probable cause after he was discovered in the presence of the officers carrying a concealed pistol without a permit, in violation of Alabama state law. There were no interrogations of the defendant, and although his detention and arrest were both proper, the Government concedes that any post-arrest statements made by the defendant were not Mirandized and therefore cannot be admitted as substantive evidence against him.[1] Finally, the law does not require the Government to prove that the defendant made a knowing, voluntary, and intelligent waiver of his right to refuse a police search; rather, the Government need only show what is readily apparent in this case: that the defendant's consent to search was voluntary.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The Government has no intention of relying upon any of the defendant's post-arrest statements in its case-in-chief but may nevertheless seek to introduce them into evidence at trial under the rules governing impeachment of a witness. *See Oregon v. Hass*, 420 U.S. 714, 721-22 (1975).

## Argument

Not every officer-citizen encounter triggers Fourth Amendment concerns.  The central inquiry is whether, within the confines of the law, the police acted reasonably.  Here, the Motion calls into question essentially four actions of the arresting officer: (1) the initiation of an encounter with the defendant and the *Terry* stop that ensued; (2) the pre-arrest search of the defendant's bag (including the smaller gun case); (3) the arrest; and (4) the post-arrest search of the defendant's bag (including the smaller toiletry kit).  All four actions were lawful, and the evidence seized from the defendant should not be suppressed.

1.    **The Police Acted Reasonably In Approaching And Briefly Detaining The Defendant.**

   A.    The Initial Encounter

When Officer Creighton observed the defendant, dressed in all dark clothing, walking along a set of railroad tracks shortly after midnight, and in the vicinity of several recent burglaries, he did what any reasonable police officer would do.  He stopped his vehicle, got out, approached the defendant, and asked him a series of general questions.  There was absolutely nothing wrong with that.  "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *United States v. Drayton*, 536 U.S. 194, 200 (2002).  Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage – provided they do not induce cooperation by coercive means.  *Id.* at 201 (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)).

In this case, there is no evidence of any coercion.  Officer Creighton never unholstered his weapon or made any physical contact with the defendant or did anything that could be

construed as a show of authority or physical force.  In fact, everything that took place between Officer Creighton and the defendant suggests that it was completely cooperative.[2]  Therefore, the initial consensual encounter between the police officer and the defendant did not violate any of the defendant's constitutional rights, and any statements made by the defendant during that encounter are properly admissible under the Federal Rules of Evidence.  *See Florida v. Royer*, 460 U.S. 491, 497 (1983) ("A law enforcement officer does not violate the Fourth Amendment by merely approaching an individual in a public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."); *see also United States v. Armstrong*, 722 F.2d 681, 685 (11th Cir. 1984).

B.    The Terry Stop

After the initial, consensual encounter, Officer Creighton briefly detained the defendant in order to check his identification card for any outstanding warrants.  This, too, was lawful police activity.  "The Fourth Amendment permits an officer to stop and briefly detain a person for investigative purposes if the officer has a reasonable, specific, and articulable suspicion that criminal activity is afoot."  *Terry v. Ohio*, 392 U.S. 1, 21-23 (1968).  The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.  *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Here, Officer Creighton had observed the defendant, dressed in all dark clothing and carrying a dark-colored bag, walking along the train tracks after midnight.  He knew that the area where the defendant was walking had recently played host to a series of burglaries and other

---

[2] This is true regardless of the fact that Officer Creighton did not specifically inform the defendant of his right to disengage from the conversation.  *See INS v. Delgado*, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.").

crimes, including an unsolved automobile break-in the night before.  Moreover, Officer

Creighton knew that someone who wanted to walk into the city of Opelika (as the defendant

claimed he was doing) would normally use the lighted sidewalk, unless he was hoping to avoid

detection.  Even though Officer Creighton could not readily discern that the defendant was doing

something illegal, these circumstances, viewed in their totality, would support a reasonable,

commonsense suspicion that some kind of criminal activity was afoot.  *See United States v.

Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) ("[A] reasonable suspicion of criminal activity may

be formed by observing exclusively legal activity.").

In light of his suspicion, Officer Creighton reasonably decided to check the defendant's

identification for outstanding warrants.  *See, e.g.*, *United States v. Purcell*, 236 F.3d 1274, 1278

(11th Cir. 2001) ("The request for criminal histories as part of a routine computer check is

justified for officer safety.  It is both reasonable and minimally intrusive.").  There is no evidence

that the warrant check unreasonably prolonged the stop, that it was a pretext for something else,

or that it was anything other than a routine procedure.  Accordingly, the officer's actions were

entirely legal.  *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1146-47 (11th Cir. 2004)

(holding that a prompt, limited detention based on reasonable, articulable suspicion and

minimally intrusive techniques constituted a legal *Terry* stop).

## 2. The Pre-Arrest Search Of The Defendant's Bag Was Justified By The Defendant's Verbal Consent.

### A. The Larger Gym-Bag

While Officer Creighton was checking the defendant's identification, he was joined at the

scene by Auburn Police Officer Joseph Morris.  At that time, due to the suspicious circumstances

he had observed, and out of a concern for his safety, Officer Creighton asked the defendant for

permission to search the gym-bag he was carrying.  The defendant voluntarily consented, and the warrantless search that followed was entirely lawful.

One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent.  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  The government bears the burden of proving the voluntariness of the consent.  *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  Whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.  *United States v. Butler*, 102 F.3d 1191, 1197 (11th Cir. 1997).

Relevant factors in determining voluntariness include (1) the location of the encounter (private versus public); (2) the number of officers present, and whether the officers are in uniform; (3) whether there is any display of weapons or physical touching; (4) the language or tone of voice of the officers; (5) whether the officers physically blocked the suspect's path; (6) whether the officers retained the suspect's documentation for an inordinate amount of time; (7) whether there was a suggestion that the defendant was the focus of an investigation such that failure to cooperate would indicate guilt; (8) whether the officers informed the suspect that cooperation is voluntary, consent may be refused, and an attorney may be consulted; (9) the suspect's age, education, and intelligence; and (10) the overall length of the encounter.  *See United States v. Garcia*, 132 F. Supp. 2d 1338, 1342 (M.D. Fla. 2000) (citing cases).

Analyzed against the circumstances of this case, the factors enumerated above strongly support a finding that the defendant's consent was voluntary.  The encounter occurred outside in a public place, and there were only two uniformed officers present.  Neither officer unholstered his weapon or made any other show of authority; nor did the officers physically touch or restrain

the defendant in any way.  There is no evidence that the officers used a particularly forceful or intimidating tone of voice.  The defendant's path was not blocked.  There was no suggestion that the defendant was the focus of any investigation, although Officer Creighton did advise the defendant that there had been a rash of burglaries in the area.  The defendant was old enough (49) and experienced enough (three prior felony convictions) to understand that he could refuse consent.  And the entire encounter with the police, which to that point had lasted only a few minutes, was nothing but cooperative.  In fact, the defendant not only consented to the search, but he actually started to unzip the bag himself.  This act alone precludes any contention by the defendant that he misunderstood the officer's request.  *Cf. United States v. Soto*, No. 91-4213, 988 F.2d 1548, 1993 U.S. App. LEXIS 5415 at * 29 (10th Cir. Mar. 22, 1993) (walking through similar analysis with similar conclusion).

Only three factors – the defendant's belief that incriminating evidence would be found, the officers' retention of his identification, and the fact that he was not informed of his right to refuse – do not weigh in favor of a voluntary consent, and these are not dispositive.  *See United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984) (no one factor is dispositive); *United States v. Purcell*, 236 F.3d 1274, 1282 (11th Cir. Fla. 2001) ("[W]hether the officer had returned the driver's license of the defendant at the time the defendant consented to the search is a factor we shall consider in evaluating the totality of the circumstances, but it is not a litmus test for voluntary consent."); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (holding that the government need not establish knowledge of the right to refuse consent as the *sine qua non* of an effective consent).

The defendant argues that, to the extent he may have waived his right to refuse a police search, his waiver was not knowing, voluntary, and intelligent under the totality of

circumstances. *See* Mot. at 4. But the Supreme Court has long held that the doctrine of waivers is inapplicable to a consent-to-search analysis: "[T]here is nothing in the purposes or application of the waiver requirements of *Johnson v. Zerbst* [304 U.S. 458, 464 (1938)] that justifies, much less compels, the easy equation of a knowing waiver with a consent search. To make such an equation is to generalize from the broad rhetoric of some of our decisions, and to ignore the substance of the differing constitutional guarantees." *Schneckloth*, 412 U.S. at 246; *see also, e.g.*, *United States v. Garcia*, 56 F.3d 418, 423-24 (2d Cir. 1995) (holding that consent may be valid even though defendant was not informed of his right to refuse).

   B.   <u>The Smaller Gun Case</u>

      1.   *Consent To Search*

The defendant might argue that, although he consented to a search of the gym-bag, he did not expressly consent to a search of any smaller containers found inside the bag.[3] But such an argument would be undercut by the general nature of the consent that was sought and received.

Under the law of this Circuit, if a defendant voluntarily consents to the search of a container in his possession, the police may search any containers found within that container without obtaining additional consent. *See United States v. Zapata*, 180 F.3d 1237, 1243 (11th Cir. 1999) ("A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items."); *United States v. Harris*, 928 F.2d 1113, 1117-18 (11th Cir. 1991) (consent to search vehicle included implicit consent to search luggage in trunk because defendant did not specifically limit consent or request that search be discontinued after defendant consented to search of vehicle for illegal contraband).

Other Circuits have recognized the same rule. *See, e.g.*, *United States v. Jackson*, 381 F.3d 984, 988-89 (10th Cir. 2004) (consent to search included closed container of baby powder

---

[3] This argument does not expressly appear anywhere in the defendant's Motion.

in carry-on baggage; it was objectively reasonable for officer to understand container to be in scope of consent when officer told suspect he wanted to search for narcotics, and suspect did not object to search of container); *United States v Jones*, 356 F.3d 529, 533-34 (4th Cir. 2004) (scope of search did not exceed consent under the reasonable person standard because officer searched locked box in bag after suspect gave general consent to search bag); *United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997) (consent to "look" inside bag included searching closed container within bag because officer did not specify what items he was looking for); *United States v. Mire*, 51 F.3d 349, 352 (2d Cir. 1995) (consent to search tote bag included implicit consent to search sneakers inside bag); *United States v. Springs*, 936 F.2d 1330, 1334-35 (D.C. Cir. 1991) (consent to search tote bag for narcotics included implicit consent to search baby powder container that might contain narcotics);

Concededly, the scope of Officer Creighton's search was not limitless, as it was still constrained by the bounds of reasonableness. Nevertheless, both small containers at issue here – a gun case and a toiletry kit – were unlocked and could be easily opened without being damaged. They were also the two most prominent contents of the gym-bag. Furthermore, the defendant was standing close-by observing the search, and if he had wanted to limit the search at all he could have said so. Instead, he remained cooperative and said nothing as Officer Creighton proceeded to open the gun case. Under these facts, it was reasonable for Officer Creighton to conclude that the defendant's consent extended to the smaller containers within the gym-bag. *Cf., e.g.*, *Jones*, 356 F.3d at 533 ("[A] suspect's failure to object (or withdraw his consent) when an officer exceeds limits allegedly set by the suspect is a strong indicator that the search was within the proper bounds of the consent search.").

2.      *The Plain View Doctrine*

Of course, even if the defendant had tried to limit the search to exclude the smaller containers, his efforts with respect to the gun case would have been in vain.  Because the case immediately betrayed the incriminating nature of its contents, the gun and ammunition found inside were in Officer Creighton's plain view, and the officer's warrantless seizure of the case was entirely lawful.

The "plain view" doctrine allows a warrantless seizure where (1) an officer was lawfully located in the place from which the seized object could be plainly viewed and had a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.  *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006).  For an item's incriminating character to be "immediately apparent," the police merely need probable cause to believe that the item is contraband.  *United States v. Simpson*, No. 07-10872, 2007 U.S. App. LEXIS 28982, *7-8 (11th Cir. Dec. 11, 2007) (unpub.); *Texas v. Brown*, 460 U.S. 730 (1983)).

Although a person generally has an expectation of privacy in items he places in a closed container, some containers so betray their contents as to abrogate any such expectation.  *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citing *United States v. Huffhines*, 967 F.2d 314, 319 (9th Cir. 1992)).  The contents of such containers are treated as being in plain view.  *United States v. Donnes*, 947 F.2d 1430, 1437-38 (10th Cir. 1991).

In footnote 13 to its decision in *Arkansas v. Sanders*, 442 U.S. 753 (1979), the Supreme Court specifically cited a gun case as an example of a container in which the owner has no expectation of privacy:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy

> because their contents can be inferred from their outward appearance.
> Similarly, in some cases the contents of a package will be open to "plain
> view," thereby obviating the need for a warrant.

442 U.S. at 765 n.13. Although the Court later overruled *Sanders*, it did so on an unrelated ground involving an application of the warrant requirement's automobile exception. *See California v. Acevedo*, 500 U.S. 565, 569 (1991). The *Sanders* footnote survived and has been widely adopted in the federal courts as the "plain view container" or "single purpose container" rule. *See, e.g.*, *Robbins v. California*, 453 U.S. 420, 427 (1981); *United States v. Banks*, No. 06-3593, 2008 U.S. App. LEXIS 326, *6-7 (8th Cir. Jan. 9, 2008) (unpub.); *United States v. Knoll*, 16 F.3d 1313, 1320-21 (2d Cir. 1994); *United States v. Williams*, 41 F.3d 192, 196-97 (4th Cir. 1994); *United States v. Villarreal*, 963 F.2d 770, 776 n.2 (5th Cir. 1992).

Beginning with *Sanders*, these cases universally agree that "[a] gun case is the very model of a single-purpose container." *See, e.g.*, *Banks*, 2008 U.S. App. LEXIS 326 at *10 (citing *Robbins*, 453 U.S. at 427). Although gun cases vary in characteristics, and each case must be evaluated on its own facts, if the container at issue is readily identifiable as a gun case by its distinctive configuration, it will be treated as a single-purpose container. *See id.*

In this case, Officer Creighton immediately recognized the container for what it was -- a heavy, soft-cover gun case that left little doubt as to what it contained. Therefore, the gun and ammunition found inside were in the officer's plain view at the time he conducted his consent search of the gym-bag. Because the contents were in plain view, the defendant did not have a reasonable expectation of privacy in them, his Fourth Amendment rights were not violated by the search, and the evidence cannot lawfully be suppressed.[4]

---

[4] Search of the gun case was also justified out of concern for officer safety. *See Michigan v. Long*, 463 U.S. 1032, 1051 (1983) (officers may take reasonable steps to ensure their safety).

3.    **The Warrantless Arrest Was Reasonable, As The Officers Had Probable Cause To Believe That The Defendant Was Then Engaged In A Violation Of State Law.**

The defendant was not under arrest or detained in any way until Officer Creighton discovered the gun. At that point, the appearance of the gun and the defendant's own admission that he did not have a license to carry it gave Officer Creighton probable cause to believe that the defendant was then engaged in criminal activity – namely, a violation of the Alabama state law that criminalizes carrying a concealed weapon without a permit. *See* Code of Ala. § 13A-11-73 (2007); *see also generally Bagony v. Birmingham*, 371 So. 2d 80 (Ala. Crim. App. 1979) (holding that where officers were justified in stop and frisk of defendant, upon finding the pistol on the defendant, the officers then had probable cause to arrest him for carrying a concealed pistol); *cf. E.M. v. State*, 675 So. 2d 90 (Ala. Crim. App. 1995) (holding that a prosecutor may prove that the accused was not issued a license for carrying a gun by offering evidence that the accused was unable to produce a license when requested to do so). It was, therefore, not only reasonable but also Officer Creighton's sworn duty to arrest the defendant for violating the law. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 113 (1975) (warrantless arrests permitted for offenses committed in the presence of the arresting officer, as requiring a warrant in such instances would constitute "an intolerable handicap for legitimate law enforcement").

4.    **The Post-Arrest Search Was Lawful.**

After placing the defendant under arrest, Officer Creighton resumed his search of the gym-bag. Within a minute or two, he had located the other smaller container – a toiletry kit that held another gun and more ammunition. This continuation of the earlier search was based on the defendant's ongoing consent (see discussion above), as well as the exception to the warrant requirement for a search incident to a lawful arrest.

13

When a container is within the immediate control of a suspect at the beginning of an encounter with law enforcement officers, the officers can search the container incident to an arrest if (1) the search is conducted at the scene of the arrest, and (2) any delay in the search is a reasonable one. *See United States v. Han*, 74 F.3d 537, 543 (4th Cir. 1996). "The justification or reason for the authority to search incident to lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." *United States v. Goddard*, 312 F.3d 1360, 1364 (11th Cir. 2002). Any delay in performing the searches, such as when a defendant is first transported to another location, does not impact the legality of the searches. *See United States v. Edwards*, 415 U.S. 800, 803 (1974) ("[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention.")

Here, there is no evidence that the police were less than prompt in carrying out their on-the-scene investigation. In fact, the resumed search of the gym-bag (and the toiletry kit inside it) took place immediately after the defendant's arrest while both the officers and the defendant were still on the scene. The entire search took only a few minutes. Under those circumstances, the search was lawfully undertaken in connection with the defendant's arrest.[5]

Indeed, the facts of this case are analogous to those in another case out of the Fourth Circuit, *United States v. Nelson*, 102 F.3d 1344 (4th Cir. 1996). There, agents arrested the defendant in the front room of an apartment, removed his shoulder bag, took him to an upstairs bedroom for questioning, and searched the bag – all within a few minutes. The district court denied the defendant's motion to suppress, and the Fourth Circuit affirmed. *See id.* at 1347

---

[5] In addition to the defendant's consent and subsequent arrest, the search is also justifiable under the inevitable discovery doctrine, as the toiletry kit was ultimately searched and inventoried as part of the normal impound procedures of the Auburn Police Department. *See generally United States v. Terzado-Madruga*, 897 F.2d 1099, 1114 (11th Cir. 1990).

("Pragmatic necessity requires that we uphold the validity and reasonableness of a search incident to arrest if the search is part of the specific law enforcement operation during which the search occurs."); *cf. United States v. Jones*, No. 06-12569, 218 Fed. Appx. 916, 918-19 (11th Cir. Feb. 27, 2007) (unpub.) (district court did not err in denying suppression motion where post-arrest search of defendant's bag occurred while he was restrained).

### <u>Conclusion</u>

For the foregoing reasons, the Government respectfully asks this Court to deny the defendant's Motion and permit the admission into evidence of all items seized during the search of the defendant on the day of his arrest.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

*/s/Nathan D. Stump*
NATHAN D. STUMP
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36104-3429
Tel: (334) 223-7280
Fax: (334) 223-7560
Email: nathan.stump@usdoj.gov

February 4, 2008

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
            v.                    )     CR. NO.___3:07cr317-WKW-WC_____
                                  )
ROBERT DOUGLAS BARNETT            )
                                  )

## CERTIFICATE OF SERVICE

        I, Nathan D. Stump, Assistant United States Attorney, hereby certify that on this the 4th

day of February, 2008, I electronically filed the foregoing with the Clerk of the Court using the

CM/ECF system, which automatically served a copy of the foregoing upon all counsel of record,

including Christine A. Freeman, Esq., counsel for the defendant.

                              Respectfully submitted,

                              */s/Nathan D. Stump*
                              NATHAN D. STUMP
                              131 Clayton Street
                              Montgomery, AL 36104
                              Phone: (334)223-7280
                              Fax: (334)223-7135
                              E-mail: nathan.stump@usdoj.gov

16

# Special Report
# City of Auburn Police Department

**CASE NUMBER:**05005598                    **PAGE** 1 OF  1 **PAGES**

**DATE & TIME OF ORIGINAL REPORT:** 5-4-05 00:22
**LOCATION OF OCCURRENCE:** Saugahatchee/CSX RR
**VICTIM/COMPLAINANT:**   City of Auburn
**TELEPHONE#:** (334) 501-3100
**RESIDENCE ADDRESS:**
**SUBJECT OF THIS REPORT: Robert Douglas Barnett**

On the above date and time I was on routine patrol in the area of Saugahatchee Rd. and CSX RR. This is also where the business of The Highlands bar is located. There was a recent auto burglary at The Highlands on 5-3-05 that occurred between 2300 hrs and 0145 hrs (ref case number 05005549), after speaking with Officer McCormick, it was learned that the victim's vehicle in that auto burglary was parked in that back of the parking lot, near the dumpster, which is right next to the railroad tracks. While on patrol I observed a black male dressed in all dark clothing walking along the railroad tracks. I contacted him and asked for his identification. I asked where he was coming from and going to and he stated that he was coming from the bowling alley and walking home to Opelika along the tracks. While I was running his ID card and checking for warrants Officer Morris arrived on scene. Due to the totality of the circumstances (the time of night, 00:22hrs, the recent burglary, the all dark clothing and officer's safety reasons) I felt the need to search his bag that he was carrying. I then asked for permission to search his gym-type bag that he was carrying and I told that this was an area where we have had a few break-ins. He stated that he would not mind if I looked in his bag. While looking in the bag I located a smaller bag used to carry a pistol. When I opened this bag I located a small .25 semi-auto pistol. Barnett stated that he did not have a permit for the pistol. I then placed him under arrest for carrying a pistol without a permit. Officer Morris and I continued to search the bag and located another bag within the gym-type bag, and in this bag was a .357 revolver with several boxes of ammunition in the bag. Both weapons were unloaded, but the fully loaded magazine for the .25 was in the same pistol bag with it. Both handguns and ammunition were taken into evidence and placed into property at the Auburn Police Dept. While at the Lee Co. Jail I had dispatch run a criminal history on Barnett and it was discovered that he had two prior convictions for robbery, one in 1976 and another in 1982, both of which he was sentenced to prison. It was also discovered that he was convicted in 1991 of a felon in possession of a handgun. All of the above listed previous offenses occurred in Opelika.

**REPORTING OFFICER:**     **Michael Creighton**          **BADGE#** 6519