IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 3:07-cr-317-WKW |
| | ) | [WO] |
| ROBERT DOUGLAS BARNETT | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Currently pending before the Court is Defendant's Motion to Suppress (Doc. #10).

On 7 February 2008, this Court held a hearing on Defendant's Motion.  On 12 February

2008, the Government filed a post hearing brief and on 23 February 2008, Defendant filed

a reply.  Defendant seeks to suppress "all items seized from the Defendant on or about May

4, 2005, all information obtained from such seizures, and all information, including

statements, obtained as a result of Mr. Barnett's arrest, search and interrogations on or about

May 4, 2005."  (Doc. #10 at 1).  Upon consideration of the motion, the testimony at the

evidentiary hearing, and the briefs, the undersigned RECOMMENDS the motion be

GRANTED in part and DENIED in part.

**I.    BACKGROUND**

Based on the parties' briefs and testimony at the hearing held on 7 February 2008, and

to a preponderance of the evidence,[1] the Court finds as follows:

In the days preceding 4 May 2005, there were several vehicle break-ins in the parking

---

[1]  The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence.
*United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489
(1972)).

lot of the Highlands bar, a local "sports bar," located on the corner of Opelika Road and Saugahatchee Road in Auburn, Alabama. Officer Creighton, at the time a thirteen-month veteran of the Auburn police department, was aware of the break-ins through dispatch reports, and information passed to him by other officers on the day-shift. One of the break-ins occurred on or about 3 May 2005. The police had no suspect for the break-ins. As a result of the break-ins, Officer Creighton was instructed to give the area "extra patrol."

On 4 May 2005, Officer Creighton was on patrol in the area close to the Highland's bar, in a marked police vehicle. At around 12:15 a.m., while crossing the railroad tracks on Saugahatchee Road, heading toward Opelika Road, approximately one-hundred yards from the Highland's bar parking lot, he noticed Robert Barnett (Barnett) walking the railroad tracks, heading towards Saugahatchee Road and decided to approach him. Barnett was wearing dark clothing, including a dark jacket, despite the warm weather, and carrying a dark duffel bag over his shoulder.

Upon seeing Barnett, Officer Creighton radioed dispatch and informed them he was exiting his vehicle to interact with a "suspicious black male." Sergeant Morris responded to the call and radioed that he was *en route* to back up Officer Creighton. Officer Creighton exited his vehicle, called out to Barnett and approached him. Officer Creighton indicated both verbally and with his hands that he would like to speak to Barnett. Barnett and Officer Creighton walked towards each other. Officer Creighton remarked at the late hour and asked Barnett why he was walking the railroad tracks. Barnett answered that he had recently

2

left a nearby bowling alley and was walking the tracks on his way to Opelika (a nearby town).  Officer Creighton asked Barnett why he was not walking on Opelika Road or its sidewalks, which run parallel to the tracks. Barnett responded by asking Officer Creighton why he could not walk the tracks.

Officer Creighton responded by informing Barnett of the recent break-ins in the area and asked Barnett if he was responsible for any of them.  Barnett said no.  Officer Creighton then asked Barnett for identification.  Barnett gave Officer Creighton a State of Alabama identification card.  Officer Creighton called the identification number into dispatch and requested a warrants check with the surrounding agencies.  At some point Sergeant Morris arrived on the scene.  He parked his patrol car farther down the street and in a position facing opposite that of Officer Creighton's vehicle and approached Officer Creighton and Barnett.  Barnett stood between the two officers.  About a minute or two after calling dispatch, Officer Creighton was informed there were no outstanding warrants on Barnett.  At that time, Officer Creighton either handed the state identification card back to Barnett, kept it in his own possession, or handed it to Sergeant Morris.  Officer Creighton then asked Barnett for permission to search the bag he was carrying.  Barnett consented and began to open the bag for the officers.  Officer Creighton asked if he could open and look inside the bag himself.  Barnett handed the bag to the officer.

Officer Creighton opened the bag and saw several items of clothing and what he believed to be a pistol case.  He opened the pistol case and found a small .25 caliber semi-

3

automatic pistol.  He then turned to Barnett and said something to the effect of: "I imagine you don't have a permit for this do you?"  Barnett said no.  The officers placed handcuffs on Barnett, searched his person, and placed him in the back seat of the patrol car.  The officers then inventoried the rest of Barnett's bag incident to his arrest.

Inside the pistol case, they also found a box of .25 caliber pistol ammunition, a loaded magazine which matched the .25 caliber pistol, .270 caliber rifle round, a .9mm pistol round, and a .22 caliber round. Inside the duffel bag, they found more clothes, a perfume or cologne gift set, and a black vinyl shaving kit.  Inside the shaving kit they found a .357 revolver and a box of .357 ammunition.  The officers found some lose .38 special ammunition but could not recall if they had found it in the shaving kit or the pistol case.  The also officers found several coins and bills of various foreign currency, a pair of dice, and baseball cards, inside the duffel bag.

The entire stop - from the time Officer Creighton first approached Barnett, till the time he was taken away from the scene - lasted approximately ten minutes.  At no time was Barnett advised of his *Miranda* rights.

## II.    DISCUSSION

Barnett requests suppression based on the following arguments: First, "[t]he warrantless detention and arrest of Mr. Barnett on May 4, 2005[,] were without probable cause or proper legal authority;" Second, "[t]he search of Mr. Barnett on May 4, 2005[,] was the fruit of his improper detention and arrest and was without probable cause or proper legal

authority;"  Third, "[t]he interrogations of Mr. Barnett on May 4, 2005[,] were the fruit of

his improper detention and arrest in violation of the Fourth Amendment and were in

violation of his rights under the Fifth Amendment;"[2]  Fourth, "Mr. Barnett's waivers, if any,

of his rights to refuse a police search or his rights to request counsel during custodial

interrogation, were not knowing, voluntary, and intelligent under the totality of

circumstances."  (Doc. #10 at 3-4).

        In his brief and at the hearing, counsel for the Government conceded "that any post-

arrest statements made by the defendant were not *Mirandized* and therefore cannot be

admitted as substantive evidence against him."  (Doc. #23 at 3). The Court agrees that any

post-arrest statements made by Barnett should be suppressed.  *See Miranda v. Ariz.*, 384

U.S. 436, 478-79 (1966).  However, the Government maintains it may use any statement

made by Barnett prior to his arrest and, in particular, his statement of admission that he did

not possess a license for the .25 caliber pistol.  At the conclusion of the hearing, the

undersigned asked both parties to brief the issue.  The Court will address the arguments as

follows:

---

[2] The "fruit" or "fruit of the poisonous tree" doctrine refers to "**evidence** obtained in an encounter that is in
violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived
from the illegal conduct."  *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003) (emphasis added).
The Court takes Barnett's arguments here to mean that his search and interrogation were improper because
his detention and arrest were improper, and the fruits of the search and detention must therefore be
suppressed.

**A. The Stop**

**1. Probable Cause**

In his brief, Barnett argues that "[t]here must be a particularized finding of probable cause for the **detention or arrest** of a particular individual [and] Barnett's walking along the road or railroad tracks did not constitute an offense." (Doc. #10 at 4) (emphasis added). In other words, Barnett argues that the police must have probable cause of a particularized offense to detain an individual. Barnett is correct that probable cause is necessary for an arrest, however, probable cause is not necessary for all detentions. The Court will address the issue of the necessity of probable cause for a detention here and determine whether there was probable cause for the arrest below.

Barnett relies, generally, on *United States v. Ocampo*, 492 F. Supp. 1211 (D.C.N.Y., 1980) *aff'd in part, rev'd in part*, 650 F.2d 421 (2d Cir. 1981), for his assertion that probable cause is required for detention or arrest. Based on his string citing of *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) and *Sibron v. New York*, 392 U.S. 40, 62 (1968), it appears Barnett is referring to this statement by the *Ocampo* court:

> A search or seizure must, however, be supported by probable cause with respect to the person or object in question, and "(t)his requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be."

*Ocampo*, 492 at 1227 (citing *Ybarra*, 444 U.S. at 91; *Sibron*, 392 U.S. at 62). However, the

seizure discussed by the *Ocampo* court was a full blown arrest.[3]  The standards for the temporary detention of an individual, or merely a police-citizen interaction, versus those of an arrest are quite different.

Probable cause is not necessary for the seizure of an individual which stops short of an arrest.  *Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime-'arrests' in traditional terminology.").  The crux of *Terry*, and its progeny, is that the non-arrest, detention of an individual may be allowed under the Fourth Amendment without the need for probable cause.  *Id*.; *See also United States v. Mikell*, 102 F.3d 470, 474 (11th Cir. 1996).  As the Supreme Court stated:

> If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether 'probable cause' existed to justify the search and seizure which took place. However, that is not the case.
> . . .
> But we deal here with an entire rubric of police conduct-necessarily swift action predicated upon the on-the-spot observations of the officer on the beat-which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.

*Terry*, 392 U.S. at 20.  Thus, short of arrest, Officer Creighton was not required to have probable cause to briefly detain or question Barnett.

## 2. "Other Legal Authority"

Barnett also argues there is no other legal authority for Barnett's detention.  This

---

[3]  Indeed the Supreme Court in both *Ybarra* and *Sibron* discuss probable cause in relation to an arrest not a non-arrest detention.

Court must determine first whether Barnett was detained prior to arrest. Second, if the Court finds he was detained prior to arrest, the Court must then determine whether the detention was lawful.

As the Eleventh Circuit recognized:

The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Fl. v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Ill.*, 422 U.S. 590 (1975).

*United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

The facts surrounding the initial encounter between Officer Creighton and Barnett establish this was not a detention, but rather, a brief, consensual, and non-coercive interaction, which is not subject to Fourth Amendment scrutiny. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search." *United States v. Drayton*, 536 U.S. 194, 200-01 (2002). Here, Officer Creighton approached Barnett, posed questions, asked for and received his identification and requested consent to search.

Barnett argues the encounter was not consensual and Officer Creighton's questions were "accusatory and leading statements." (Doc. #30 at 5). He argues there were several factors which led him to believe the encounter was coercive and not consensual, specifically:

he was stopped late at night, in a secluded area, with trees on either side of the railroad tracks; nearby street lights were not lit; he was on foot, but the uniformed police officers detaining him were in two marked police cars;  Officer Creighton used hand gestures to direct Barnett to come toward the officer;  Officer Creighton informed Barnett he was being contacted because of criminal activity;  without a typical "traffic" purpose to the stop, Barnett would have no reason to believe the stop would be brief; Barnett stood between the two cars; and because of the hour and location, no other traffic passed by and thus Barnett would not have felt the protection of passers-by  witnessing the interaction. *See* Doc. #30 at 4-5.  Barnett is correct that if the encounter was coercive, then it is subject to Fourth Amendment scrutiny.  *Drayton*, 536 U.S. at 200-01.

In *Fl. v. Bostick*, the Supreme Court addressed the issue of whether the police questioning an individual in a confined area, would trigger Fourth Amendment scrutiny. 501 U.S. at 434.  In that case, police officers, admittedly without articulable suspicion, approached the defendant while he was sitting on a bus and asked to inspect his ticket and identification. 501 U.S. 431-32.  Although neither the ticket nor the identification revealed any suspicious or criminal activity, the police officers informed the defendant they were narcotics agents looking for drugs and asked consent to search the defendant's bags.  *Id*. Unlike the present case, the defendant in *Bostick* disputed whether consent to search was given.  *Id*.

In addressing whether the police encounter in *Bostick* created a seizure, because

9

Bostick may have felt he was not free to leave due to the confined nature of an encounter on a bus, the Supreme Court stated: "the mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him." *Id*. at 436. "Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive." *Id*. Similarly, the factors listed by Barnett regarding his location, surrounding environment, and the time of night are simply a natural result of Barnett's decision to walk the railroad tracks at that time of night and would have been present even if he had not been stopped by Officer Creighton. These factors say nothing about whether or not the police conduct at issue was coercive.

Further, the fact that Barnett may have stood in between the police officers and they may have used hand gestures to indicate their intentions to speak to them does not make this a non-consensual or coercive encounter. In *INS v. Delgado*, "several agents positioned themselves near the buildings' exits, while other agents dispersed throughout the factory to question most, but not all, employees at their work stations. The agents displayed badges, carried walkie-talkies, and were armed, although at no point during any of the surveys was a weapon ever drawn." 466 U.S. 210, 212 (1984). The Supreme Court concluded:

> This conduct should have given respondents no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer.
> . . .
> What is apparent from Royer and Brown is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of

10

the response.  *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 231-234, 93 S.Ct. 2041, 2049-2051, 36 L.Ed.2d 854 (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the persons refuses[sic] to answer and the police take additional steps-such as those taken in Brown-to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. *United States v. Mendenhall*, 446 U.S., at 554, 100 S.Ct., at 1877; *see Terry v. Ohio*, 392 U.S., at 21, 88 S.Ct., at 1879.

*Delgado*, 466 U.S. at 212, 216-17.

Barnett has not shown the circumstances of the encounter were so intimidating that he would not have felt free to leave.  The officer testified at the hearing that if Barnett had refused the officer's request to talk, he would have had no recourse but to radio ahead to others to be on the lookout for a suspicious male walking the tracks.  Further, Barnett never refused to answer any questions nor any requests of the officers, and the officers never drew their weapons.  Thus, the undersigned determines the encounter between Barnett and the police officers began as a brief, consensual, and non-coercive interaction.

At the hearing, the Government conceded that once Barnett gave his identification card to Officer Creighton, the stop matured into a *Terry* stop because Barnett would not have been free to leave.  Although Barnett states this is a necessary concession under Eleventh Circuit case law, the Court does not agree.  The case cited by Barnett, *United States v. Thompson,* 712 F.2d 1356 (11th Cir. 1983), involved retention of a driver's licence during a vehicle stop.  In cases involving an officer's retention of a driver's license, the Courts look to whether the driver of the vehicle would reasonably believe they are free to leave, because

11

driving without a license is illegal. *Id*. at 1359. Here, Barnett was not in a vehicle; thus, the retention of his state identification card would be but one factor for the Court to consider under the totality of the circumstances.[4]

However, in light of the Government's concession, the Court will analyze this portion of the stop - from the time Barnett handed his state identification card to Officer Creighton, to the time when he was placed under formal arrest - in light of the second category of police-citizen encounters, a *Terry* stop.

### 3. *Terry* Stop

"*Terry* requires that an officer have an objective, reasonable suspicion of criminal activity" in order to make the stop. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). "To determine whether reasonable suspicion exists, the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (internal quotation marks omitted). "Reasonable suspicion, while dependent upon the 'totality of the circumstances,' including both the content of the information and its reliability, 'can arise from information that is less reliable than that required to show probable cause.'" *United States v. Heard*, 367 F.3d 1275, 1278 (11th Cir. 2004) (quoting *Ala. v. White*, 496 U.S. 325, 330 (1990)). "Nevertheless, the police are

---

[4] Further, the officer testified he was unsure whether he had retained the card or given it back to Barnett, and Barnett put on no evidence the officer had retained the card in support of his contention that he did not feel free to leave.

required to articulate some minimal, objective justification for the stop." *United States v.*

*Mikell*, 102 F.3d 470, 475 (11th Cir. 1996).

In arguing that Officer Creighton did not have a proper basis for a *Terry* stop, Barnett

asserts Officer Creighton did not have any information before him, which would support a

reasonable belief Barnett was engaged in criminal activity.  At the hearing, Officer Creighton

testified to the objective factors, which informed his decision to approach Barnett, including:

the time of night he saw Barnett walking the tracks; the fact that Barnett was walking the

secluded and dark tracks when there was a nearby street running parallel to the tracks; it was

a high-crime area; there had been recent break-ins in the area for which he was instructed

to keep an eye out; and Barnett's dark clothing (including the fact that he was wearing a dark

jacket on a warm night).  Thus, Officer Creighton provided the Court with more than a

minimal, objective justification for the stop.

Barnett argues the factors Officer Creighton relied upon in making the *Terry* stop

were the most neutral of factors consisting of perfectly legal appropriate behavior.  However,

"'[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal

activity,' *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000), even if such activity

is 'seemingly innocuous to the ordinary citizen.' *United States v. Smith*, 201 F.3d 1317, 1323

(11th Cir. 2000)." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007).

Barnett also argues it would have been impossible for Officer Creighton to suspect

Barnett in the robbery of Highlands Bar, for the following reasons: there was no known

description of the suspect involved in the recent break-ins; the officer had no knowledge of how the cars were broken into; Barnett was seen walking towards the bar; there was no basis for Officer Creighton to assume that a crime had been committed; the car in the parking lot of the Highland's bar had been broken into 24 hours earlier; and the area of the stop was both a residential and business area.

The objective justification for a *Terry* stop does not need to be in relation to a crime that has already happened. *Terry* itself states that an officer may make a stop when he has a reasonable belief that "criminal activity may be afoot." *Terry*, 392 U.S. at 30. The facts surrounding the *Terry* decision involved police officers who, concerned that a robbery might soon take place, approached and stopped several suspects. *Id*. at 4-7. The point of *Terry* is that the police may make a brief 'seizure' of a citizen even before a specific crime has been committed based on objective factors of suspicion.

In determining whether "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant," *Terry*, 392 U.S. at 21, a *Terry* stop, the Court must look to the totality of the circumstances. *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002). "In evaluating the totality of the circumstances in a given case, the court may not consider each fact in isolation." *Id*. (citing *United States v. Arvizu*, 534 U.S. 266, 750-51 (2002)). Further, reasonable suspicion may exist even if each fact alone is susceptible to an innocent explanation. *Id*. (citing *Arvizu*, 534 U.S. at 751, 753). The undersigned has evaluated the totality of the circumstances and finds that the specific

and articulable facts given by Officer Creighton, which, taken together with rational inferences therefrom, reasonably warranted a *Terry* stop.

### B. The Search

Barnett argues the search of Barnett was the fruits of his improper detention and arrest and was without probable cause or proper legal authority. This Court has determined that the initial encounter with Barnett was proper: first as a brief, consensual, and non-coercive interaction; and second, after Barnett's identification card was taken, as a *Terry* stop, and will now turn its attention to the search that occurred during the *Terry* stop.

While "[a] *Terry* stop cannot be used as the basis of a 'full search' that would normally be warranted only by the existence of probable cause, consent, or a valid arrest," *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (citing *United States v. Place*, 462 U.S. 696, 706 (1983); *Fl. v. Royer*, 460 U.S. 491 (1983)), an officer may ask for consent to search during a *Terry* stop. *See*, e.g., *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004). The uncontested evidence is that Barnett gave Officer Creighton consent to search his duffel bag.

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). The totality of the facts and circumstances surrounding Barnett giving the officer consent to search in this case establish that consent was given freely and unconstrained. *Hudson v.*

*Hall*, 231 F.3d 1289, 1296 (11th Cir. 2000) ("In considering whether a consent to search was voluntary, we examine the totality of the circumstances.").

This Court has determined already the facts and circumstances surrounding the initial encounter with Barnett was a brief, consensual, and non-coercive interaction not requiring Fourth Amendment scrutiny. Those are the same facts and circumstances that existed at the time Officer Creighton asked for consent to search Barnett's duffle bag. The only change in circumstances was that Officer Creighton had asked for and received Barnett's identification card and checked it for outstanding warrants. Under a totality of the circumstances test, the fact that the officer may have been in possession of the identification card does not necessarily render the search non-consensual. *See Purcell*, 236 F.3d at 1282 ("[W]hether the officer had returned the driver's license of the defendant at the time the defendant consented to the search is a factor we shall consider in evaluating the totality of the circumstances, but it is not a litmus test for voluntary consent.").

Officer Creighton testified: he spoke to Barnett in a conversational tone; Barnett voluntarily answered his questions; Officer Creighton never ordered Barnett to open or hand over the duffel bag; and, not only did Barnett hand the officer his duffel bag, he even started to open it for him. The undersigned is satisfied that the facts and circumstances surrounding the consent search in this case reveal a free and unconstrained choice on Barnett's behalf.

Barnett argues any waivers he may have made regarding the search were not knowing, voluntary, and intelligent under the totality of the circumstances. "In evaluating

16

the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004).

At the hearing, Barnett attempted to put on evidence, through the testimony of Deborah Brenda Barnett (Deborah Barnett), Barnett's wife, that he was to "slow" to understand what the officers were saying to him and, thus, he could not have voluntarily consented. The undersigned does not find Deborah Barnett's testimony, regarding Barnett's ability to understand normal conversations, to be credible. If Barnett is as limited as Deborah Barnett suggested, the Court would be concerned as to Barnett's competence to stand trial. Deborah Barnett's testimony established Barnett had spent time in the military and was employed at the time of his arrest. Further, his answers and actions during his interaction with the officers, including his attempt to open the bag himself when the officers requested permission to search the bag, clearly demonstrate he understood the conversation and intelligently gave consent to search the bag.

Once the officers found the first gun and ascertained Barnett did not have a license to carry the weapon, they placed him under arrest. The search of the rest of the bag was proper as a search incident to the arrest. *United States v. Goddard*, 312 F.3d 1360, 1364

(11th Cir. 2002) ("[A] full search incident to a lawful arrest is not only a 'reasonable' search under the Fourth Amendment, it is also an exception to the warrant requirement."). Therefore, the search and its fruits were legal and should not be suppressed.

### C. The Arrest

Barnett also argues his arrest was made without probable cause. "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (internal quotation omitted). In this case, while conducting the initial search of Barnett's duffel bag, the officers found a pistol, pistol magazine, and ammunition. Officer Creighton asked Barnett if he had a license to carry the pistol. Barnett responded that he did not. Thus, the presence of the gun, together with Barnett's admission that he did not have a license, provided the officers with probable cause to arrest Barnett. *See* Code of Ala. § 13A-11-73 (1975); *Hickman v. State*, 548 So. 2d 1077, 1082 (Ala. Crim. App. 1989) ("Upon finding the pistol and determining that appellant had no permit or authority to carry a pistol, the officer had probable cause to arrest, and did arrest, appellant for carrying a concealed weapon.").

### D. Barnett's Pre-Arrest Statements

In light of the Court's decision that up and until the time Officer Creighton requested and received Barnett's state identification card, the encounter was a brief, consensual, and non-coercive interaction, not subject to Fourth Amendment scrutiny, any statements made

by Barnett at that time should not be suppressed.   Thus the remaining issue is whether the statement made by Barnett after Officer Creighton received Barnett's identification card, specifically, his indication that he did not have a license to carry the .25 caliber pistol, should be suppressed.

As the Court stated *supra*, at most, the time between when Officer Creighton had Barnett's identification card and the time they placed him under arrest was a *Terry* stop.  As the Government correctly notes, *Terry* stops are not "subject to the dictates of Miranda." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).  However, Barnett argues that because he was "subjected to restraints comparable to those associated with a formal arrest," he should have been advised of his *Miranda* rights even if such restraints occurred during a *Terry* stop. *Id*. at 441.  Barnett is correct that the "advice of *Miranda* rights is required if there is a restraint on freedom of movement 'of the degree associated with a formal arrest.'" *United States v. Muegge,* 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *Minn. v. Murphy*, 465 U.S. 420, 430 (1984)).   In making this determination, the Court will look to the "totality of the circumstances."  *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).

Barnett argues the "[a]pplication of *Miranda* rights turns on the facts known to the detained person. Thus, the perceptions of those involved are relevant."  (Doc. #30 at 3). This is not the law.  Rather, "[t]he test is objective:  the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *United*

*States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. "Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person. In applying this test there are several factors [courts] are to consider, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *Id*. (quotations and citations omitted).[5]

The undersigned finds the objective factors in this case show that at the time Officer Creighton asked Barnett if had a license for the pistol, a reasonable innocent person would not have believed their freedom was restrained to the degree associated with a formal arrest. At the time of the search, neither officer had brandished their weapons, touched Barnett, nor used language or a tone indicating compliance was necessary.

Barnett argues Officer Creighton's questions were accusatory and leading, because he asked them in the negative, such as: "you're not responsible for [the car break-ins] are

---

[5] The factors Barnett lists, by way of a block quote from *United States v. Blake*, 888 F.2d 795, 799 (11th Cir. 1989), as relevant to the consideration of restraint are all cases involving airport stops. As the Court stated in *Blake*: "Given the extremely intimidating nature of airport stops, this court has emphasized that verbal agreements acquiescing in officers' requests should be scrutinized exceptionally closely to ensure a complete absence of coercive influence ." 888 F.2d at 799. This is not an airport stop case and, thus, not subject to any special scrutiny.

Barnett's citation to *R. I. v. Innis*, 446 U.S. 291, 301 (1980) is also inapplicable. In *Innis*, the Supreme Court was defining "interrogation" in a case where the defendant had been arrested, was given his *Miranda* rights multiple times, and had invoked his *Miranda* right to counsel. *See id*. at 294. In this case, the Court is determining whether Barnett was so restrained as to invoke the advice of *Miranda* rights prior to his formal arrest.

you;" "you don't mind if I look in your bag;" "you don't have anything I need to know about, do you;" "I don't suppose you have a permit for that." (Doc. #30 at 5). However, those questions were asked over the course of the entire stop, not in a succinct order. Moreover, the questions appear to have been asked in a non-accusatory manner. Officer Creighton testified that his questions and discussions with Barnett were in a conversational tone and Barnett offered no evidence to the contrary. The undersigned does not find that Officer Creighton's chosen form of questioning would lead a reasonable person to believe their freedom was restrained to the degree associated with a formal arrest. *See United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989) (Statement by police that they would return with a warrant and "dig the place up" if not given consent was not coercion.).

Under the totality of the circumstances, the undersigned finds the advice of *Miranda* was not required, as there was no restraint on Barnett's freedom of movement to the degree associated with a formal arrest. Therefore, none of the statements made by Barnett made prior to the time the officers placed Barnett in handcuffs should be suppressed.

## III.    CONCLUSION

The Court finds the initial encounter between Officer Creighton and Barnett began as a brief, consensual, and non-coercive interaction, not subject to Fourth Amendment scrutiny. It matured into a lawful *Terry* stop when Officer Creighton requested and received Barnett's state identification card. During the *Terry* stop, Barnett voluntarily consented to the search of his duffel bag and after a pistol was found therein, he was lawfully arrested

21

with probable cause and a proper search incident to that arrest ensued.  Thus, neither the evidence seized during the initial search of Barnett's bag, nor the evidence seized after his arrest are due to be suppressed.  Further, the Court finds that any statements made by Barnett prior to his arrest should not be suppressed.  Finally, upon concession of the Government, and pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), any statement made by Barnett after he was handcuffed and placed under formal arrest should be suppressed.  For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Barnett's Motion to Suppress (Doc. #10) be DENIED in part and GRANTED in part.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before 17 April 2008**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*,

661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 4th day of April, 2008.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE